**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Denin J. Korgel, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER GRANTING DEFENDANT'S** |
| vs. | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | Case No. 4:11-cv-34 |
| | ) | |
| Defendant. | ) | |

_____

Plaintiff, Denin J. Korgel, seeks judicial review of the Social Security Commissioner's denial of his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433 ("Act"). The case was referred to the undersigned for final disposition by consent of the parties.

I.     BACKGROUND

A.     Procedural history

Korgel first applied for disability insurance benefits in 2005. (Tr. 97). ALJ Geyer determined Korgel was not disabled on September 8, 2007. (Tr. 107). No appeal was taken.

Korgel filed his second application for disability insurance benefits on October 12, 2007, alleging that he had been disabled since January 8, 2004. (Tr. 154). His application was denied initially and upon reconsideration, prompting him to request a hearing before an administrative law judge ("ALJ"). (Tr. 1-11). Pursuant to his request, ALJ James Geyer conducted a hearing on August 28, 2009. (Tr. 28). At the time of the hearing the disability onset date was amended to September 9, 2007. (Tr. 33).

On November 9, 2009, the ALJ issued a decision wherein he concluded that Korgel was not entitled to disability insurance benefits (Tr. 12-23). The ALJ concluded that Korgel had failed to demonstrate that he was disabled from September 6, 2007, through June 30, 2008, the last date he was insured under the Act.

Korgel requested a review of the ALJ's decision with the Appeals Council. (Tr. 7-8). The Appeals Council denied his request for review thereby rendering the ALJ's decision as the Commissioner's final decision on March 18, 2011. (Tr. 1-3). On April 12, 2011, Korgel filed a complaint with this court seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). See Docket No. 1.

Korgel filed a motion for summary judgment on September 21, 2011. See Docket No. 13. The Commissioner filed a response in opposition to Korgel's motion and his own motion for summary judgment on October 21, 2011. See Docket No. 16. Korgel filed a reply brief on November 17, 2011. See Docket No. 21.

**B.     Personal background**

Korgel was born in 1969 and was forty years old at the time of the hearing before the ALJ in August 2009. (Tr. 34). He is single and lives on a farm near Minot, North Dakota, with his sixteen year old son. (Tr. 34). He inherited the farm from his parents. (Tr. 490). His father died in 2006, and his mother and grandmother died in 2007. (Tr. 490). He has a high school education plus a year and a half of college. (Tr. 35).

Korgel was injured on August 15, 2003, while working for the City of Minot as a garbage collector. (Tr. 304). He stepped off the back of the garbage truck, slipped on some gravel and twisted his ankle on the curb. (Tr. 304). This resulted in quite a bit of pain and swelling, but no

bones were broken. (Tr. 160). He was treated at the Medical Arts clinic on August 19, 2003, and released back to work with limited walking. (Tr. 365-66). Despite various treatments, including an air splint, over the next few months, the injury remained painful. (Tr. 289). He underwent a nerve block in the lumbar spine in an attempt to relieve the pain in November 2004. (Tr. 278). Korgel maintains the nerve block punctured a disc, worsened his problems and resulted in constant low back pain. (Tr. 278, 473). He had left ankle surgery in April 2005 for tarsal tunnel syndrome. (Tr. 278). This reportedly consisted of laying the nerves and tendons back into the correct position. (Tr. 473). Improvement was reported as slight after this surgery. (Tr. 278). A ganglion cyst was removed from his left wrist on May 15, 2009. (Tr. 531).

Korgel reported that Workers Compensation determined there was nothing wrong with him in January 2004 and so the City of Minot let him go. (Tr. 477). He worked at Sykes in Minot from September 15, 2004, until November 15, 2004, doing telemarketing. (Tr. 244). He has not engaged in any substantial gainful activity since November 15, 2004. (Tr. 244). Korgel's past relevant work includes that of a railroad track repairman, carpenter, garbage collector, cook, telephone solicitor, photocopier repairman, and computer support analyst. (Tr. 270). He has alleged disability due to nerve damage and chronic back and ankle pain. (Tr. 187).

### C.      Medical evidence

#### 1.      Evidence prior to the relevant time period (8/15/03-9/8/07)

Korgel's initial injury occurred on a Friday, August 15, 2003. (Tr. 364) He was able to finish work after the injury. (Tr. 364). He had the weekend off and did not work the following Monday due to pain and swelling. (Tr. 364). He sought medical attention August 19, 2003. (Tr. 2003). Dr. Reeve described the injury as tender and swollen. (Tr. 364). X-rays were negative for

fractures. (Tr. 364). He was told he could work as long as he limited his walking, did no running or jumping on and off the truck and wore an ankle brace for three weeks. (Tr. 364). He returned to Dr. Reeve on August 27, 2003, complaining that his ankle hurt a lot more. (Tr. 363). On examination the ankle was less swollen with a fairly good range of motion. (Tr. 363). He had worn the air splint as instructed. (Tr. 363). He returned to work but was limited to sitting duties and sent for physical therapy. (Tr. 363). He returned again to Dr. Reeve on September 16, 2003, for a recheck and reported a reinjury while jumping off the garbage truck. (Tr. 362). The ankle was mildly swollen. (Tr. 362). He had been attending physical therapy. (Tr. 362). His work restrictions were continued and he was referred to an orthopedic surgeon and a physiatrist. (Tr. 362).

Korgel saw Dr. Zhang, a physiatrist, on September 22, 2003. (Tr. 360-61). Korgel rated his pain as a 3 on a 5 point scale. (Tr. 360). Some swelling was found on the medial ankle but no swelling or bruising was found on the lateral ankle. (Tr. 361). The ankle was quite tender. (Tr. 361). Korgel was able to walk without significant pain or limping but did feel some pressure. (Tr. 361). Tylox was given on an as needed basis for pain along with Celebrex for two weeks. (Tr. 361). Physical therapy was continued as was the off work status for another week. (Tr. 361).

Korgel attended physical therapy at Trinity Health Center from August 28, 2003, until November 4, 2003, for a total of fifteen visits. (Tr. 340, 353). Korgel rated his pain as a 3-4 on a 5 point scale (3-4/5) at the initial evaluation on August 28, 2003. (Tr. 343). Korgel rated his pain as 3/5 on September 3, 2003, and a 2/5 on September 5, 2003. (Tr. 345). Significant improvement in range of motion and fair to good tolerance of the exercise program was noted on September 5,

2003. (Tr. 345). Pain was reported as 2.5-3.5/5 on September 12, 2003. (Tr. 346). Pain was a 3-4/5 on September 23, 2003. (Tr. 347).

A return to work reportedly increased Korgel's symptoms. (Tr. 347). Korgel rated his pain as a 2.5-3 on a 5 point scale on September 25, 2003. (Tr. 340). Initially he improved with the therapy, but progress decreased when he returned to full work duties. (Tr. 340). A likely tear of the anterior calcaneofibular ligament (ACL) was noted on September 29, 2003, along with the observation that Korgel's injury was taking longer than normal to resolve. (Tr. 342). He was restricted to sedentary work. (Tr. 342).

On October 6, 2003, Korgel rated his pain and reported being frustrated with what he could do at work and that he was currently working eleven hour days doing computer work. (Tr. 350). Pain was reported as 2.5/5 on October 17, 2003. (Tr. 351). Improved gait and balance were noted at this visit, but Korgel continued to complain of associated pain. (Tr. 351).

Pain was reported as 1.5/5 on October 22, 2003. (Tr. 352). On October 24, 2003, pain was reported as 1/5 to 2/5 at rest and 2/5 to 3/5 with activity. (Tr. 352). On October 27, 2003 pain was reported as 2/5 to 2.5/5 at rest and 3/5 to 4/5 with activity. (Tr. 352). Laying brick at his home reportedly increased the pain in his ankle. (Tr. 352).

Korgel was discharged from physical therapy on October 30, 2003. (Tr. 353). He reported pain with activity at 3-4/5 the day he was discharged. (Tr. 353). His gait and left ankle strength were rated as within functional limits although his ankle was tender. (Tr. 353). He was given a home exercise program to follow. (Tr. 353).

At the suggestion of Dr. Zhang, Korgel was seen by Dr. Kindy for an orthopedic consultation on September 30, 2003. (Tr. 338). Tenderness and mild swelling of the left ankle with full range

of motion was noted. (Tr. 338). Dr. Kindy determined rehabilitation was incomplete and continued his physical therapy. (Tr. 339). A stirrup brace was also prescribed. (Tr. 339). Tylox was discontinued as a narcotic was not indicated at this stage of recovery. (Tr. 339). Celebrex and Tylenol were continued for pain. (Tr. 339). He was released to full work with no limitation on walking as long as he did not do any jumping and avoided uneven ground. (Tr. 339).

Korgel saw Dr. Kindy for a follow up visit on November 7, 2003, at which time he complained of excruciating pain in his left ankle which seemed to be out of proportion to the initial injury. (Tr. 336). The swelling was essentially all gone, he had full range of motion and his gait was normal. (Tr. 336). Dr. Kindy noted there might be an augmentation of symptoms due to secondary gain as the injury was covered by Workers Compensation. (Tr. 336). A bone scan was conducted and reviewed with Korgel on November 17, 2003. (Tr. 334). The bone scan was within normal limits. (Tr. 334). It was suggested Korgel see a foot and ankle specialist as Dr. Kindy could not find a cause of Korgel's reported pain. (Tr. 334).

Korgel saw Dr. Hart at the suggestion of Dr. Kindy on November 19, 2003. (Tr. 331). X-rays were negative. (Tr. 331). Ankle motion and strength were normal as was strength in the lower extremities. (Tr. 331). Dr. Hart was perplexed why he had not made better progress. (Tr. 332). An MRI was suggested. (Tr. 332). The MRI showed a very small amount of fluid within the joint but did not reveal any injury to the joint. (Tr. 327). Tendons were normal. (Tr. 327). The ankle remained tender. (Tr. 328). X-rays showed a small avulsion injury of the anterior talofibular ligament, but surgery was not indicated. (Tr. 328). More physical therapy was suggested. (Tr. 328). As was suggested, Korgel made another attempt at physical therapy starting on December 10, 2003. (Tr. 323). Korgel described his pain as ranging from a 2/5 to a 4/5. (Tr. 323). Symptoms

of plantar fascitis were noted.  (Tr. 324).  He reported increased pain from his midcalf to his toes on December 15, 2003.  (Tr. 322).  He was given orthotics to improve his gait.  (Tr. 322).  Progress notes for December 22, 2003, reveal Korgel was sure his range of motion had decreased but was actually normal.  (Tr. 321).  He complained of swelling but none was observed.  (Tr. 321).  Gait was significantly improved and normal with the orthotics.  (Tr. 321).  He expressed concerns regarding returning to work and was informed he could drive truck and ease back into working behind the truck.  (Tr. 321).

Korgel was seen by Dr. Zhang on December 29, 2003, following completion of his second attempt at physical therapy.  (Tr. 320).  The left foot showed no swelling, edema, erythmea or muscle atrophy.  (Tr. 320).  Range of motion was normal.  (Tr. 320).  Korgel reluctantly agreed to go back to work with the restriction that he alternate driving truck and working the back of the truck on an hourly basis.  (Tr. 320).  The new work schedule lasted three days, and then Korgel returned to Dr. Zhang complaining of pain.  (Tr. 318).  His ankle showed no swelling, erythmea, or edema and the strength was good.  (Tr. 318).  Very little tenderness was observed.  (Tr. 318).  Range of motion was normal.  (Tr. 318).  No cause of the pain could be identified, and he was referred to the Mayo Clinic for further evaluation provided Workers Compensation would pay for it.  (Tr. 316).  It was noted an evaluation at the Mayo Clinic was not medically necessary and could not be supported by objective medical findings.  (Tr. 316-17).  He was reduced to sedentary to light work.  (Tr. 318).

Korgel was seen at the Mayo Clinic on June 7, 2004, by an orthopedic surgeon, Dr. Turner.  (Tr. 313-14).  Korgel reported he had lost his job.  (Tr. 314).  His ankle was tender, but surgery was

ruled out as a treatment option. (Tr. 314-15). Bracing was recommended as was consultation with a neurologist. (Tr. 315).

Korgel underwent a nerve conduction study on July 14, 2004. (Tr. 308-310). Dr. Lee's diagnosis was tarsal tunnel syndrome. (Tr. 310). The tarsal tunnel syndrome was fond to be related to his August 15, 2003, work injury. (Tr. 307).

Korgel was evaluated at the Trinity Hospital Pain Center on August 13, 2004, by Dr. Colon. (Tr. 301). Korgel described his pain as a 2/5. (Tr. 301). Complex regional pain syndrome was ruled out. (Tr. 301). Compressive neuropathy was a possible diagnosis with surgery a possible treatment. (Tr. 302-03). Korgel was cautioned against strenuous activity but told there was no reason why he could not perform sedentary work. (Tr. 303).

Dr. Lee referred Korgel to Dr. Williams for further evaluation on July 28, 2004. (Tr. 304). Dr. Williams found Korgel had a significant amount of pain and that the pain was real. (Tr. 305-06). He suggested a nerve block, pain management, and retraining for sedentary work. (Tr. 306). At a recheck on September 22, 2003, Korgel rated his pain as a 1/5. (Tr. 299). Tarsal tunnel syndrome was diagnosed. (Tr. 299). Korgel was referred to a podiatrist for a surgical evaluation. (Tr. 299).

Korgel returned to Dr. Colon on October 28, 2004, for another evaluation. (Tr. 297). Korgel rated his pain as 2/5 to 3.5/5. (Tr. 297). Dr. Condon's impression was left foot neuropathic pain and tarsal tunnel syndrome which he described as probably an incidental finding. (Tr. 297). A lumbar nerve block was suggested, and Korgel agreed to undergo the procedure. (Tr. 297). A left lumbar sympathetic nerve block was performed by Dr. Colon on November 16, 2004. (Tr. 295). Korgel tolerated the procedure well. (Tr. 295).

Korgel saw Dr. Colon for a followup visit on November 29, 2004, at which time he reported the nerve block had given him no relief, and his pain was now a 5/5. (Tr. 293). Korgel reported that since undergoing the nerve block he had been experiencing a significant amount of pain in his lower back with shooting pain down his left leg and foot. (Tr. 293). Dr. Colon noted Korgel pointed to his lower iliac joint as the starting point of the pain which is far from where the procedure was performed. (Tr. 293). Korgel reported no paraesthesia however. (Tr. 293). Dr. Condon described Korgel as very anxious and demanding with many questions regarding his work situation and disability. (Tr. 293). Korgel produced some Workers Compensation paperwork he requested be filled out. (Tr. 293). Dr. Condon noted there was some question in his mind whether there might be some "secondary gain" issues with Korgel and his Workers Compensation status. (Tr. 293). Korgel was given a prescription for Oxycodone, referred to a neurologist, and an MRI was ordered. (Tr. 294). A December 10, 2004, MRI revealed mild narrowing of the L4-5 and intervertebral disc space and slight facet joint degenerative changes in the L5-S1. (Tr. 283, 285, 291). The MRI of the lumbar spine was otherwise described as unremarkable. (Tr. 292). Regional pain syndrome was ruled out. (Tr. 291). Korgel continued to complain of back and ankle pain on December 30, 2004. (Tr. 283). On January 14, 2005, Korgel again inquired about disability and whether he was disabled and expressed a concern about generating income. (Tr. 282). His medication was switched from Oxycodone to Vicodin ES. (Tr. 282). His pain was described as neuropathic. (Tr. 282).

Korgel saw Dr. Wongirad on December 23, 2005, on a self referral basis. (Tr. 278). Korgel blamed the nerve block for his lower back pain. (Tr. 278). He reportedly had left ankle surgery in April 2005 in Rapid City for tarsal tunnel syndrome. (Tr. 278). He reported no bowel or bladder problems. (Tr. 278). He was still taking Oxycodone four times per day. (Tr. 279). Dr. Wongirad

concluded his low back pain was not due to nerve damage because he still had good knee and ankle reflexes and good strength.  (Tr. 279).  Neuropathic pain in the ankle and foot were suspected along with soft tissue pain.  (Tr. 280).  The low back pain was likely due to chronic stress and strain on the low back from poor posture and limping.  (Tr. 280).  Strengthening exercises were suggested with the explanation that it would take six months before a decrease in pain would result.  (Tr. 280).

Korgel was seen by Dr. Sieg at MeritCare in Fargo, North Dakota, for a neurosurgical consultation regarding chronic back and ankle pain on June 26, 2007.  (Tr. 370-376).  He described his pain as 5-7 on a 10 point scale and reported taking Oxycodone-Acetaminophen 5/325 tablets every six hours as needed.  (Tr. 370).  He was described as moving slowly around the exam room, rising slowly from his chair and guarded in his activities.  (Tr. 373).  Korgel's pain was described as diskogenic in origin rather than radicular.  (Tr. 374).  As Korgel refused any sort of invasive care Dr. Sieg had little to offer him in way of treatment other than some Ultram samples for pain, a suggestion he establish a primary care physician in Minot, and a note to the file that Korgel should not be given narcotic medications due to the ongoing chronic nature of the problem.  (Tr. 374).

Korgel underwent an evaluation on November 27, 2006, by physical therapist, Reed Argent.  (Tr. 425-27).  Korgel reported his back and ankle pain ranged from a 3/10 on good days to a 10+/10 on bad days.  (Tr. 425).  He described numbness in the two outside toes on his left foot.  (Tr. 425).  He reported using a cane at all times.  (Tr. 426).  Examination revealed some swelling in the left foot, some limited range of motion, and fairly well preserved muscle strength.  (Tr. 426).  Argent stated Korgel would not be able to perform even sedentary gainful activity.  (Tr. 427).

Argent completed a physical capacities evaluation of Korgel on December 20, 2006.  (Tr. 422-23).  Argent found Korgel could sit, stand, or walk less than thirty minutes at a time.  (Tr. 422).

He was found able to sit and stand for two to three hours per day and walk up to one hour per day. (Tr. 422). It was noted Korgel would need to change positions often, move around periodically, and lie down at times. (Tr. 422). Lifting was limited to less than fifteen pounds, and pain was described as moderate. (Tr. 422).

Dr. Reeve's assessment of Korgel on August 8, 2007, was chronic low back pain with ankle and foot problems and depression. (Tr. 382). Tramadol 50mg was prescribed for pain. (Tr. 382). He described Korgel as disabled. (Tr. 382). Dr. Reeve noted on September 6, 2007, Korgel had a bit of trouble getting to sleep but was able to sleep through the night. (Tr. 380).

### 2.    Evidence during the relevant time period (9/9/07-6/30/08)

Korgel was seen by Dr. Reeve on December 12, 2007, for situational depression. (Tr. 388). His mother and grandmother had died recently. (Tr. 388). His Zoloft was increased from 50 mg per day to 100 mg per day. (Tr. 388).

Korgel was back to see Dr. Reeve on June 27, 2008, for a recheck of his low back pain. (Tr. 431). Korgel reported constant back pain which made him unable to sleep at night. (Tr. 431). Korgel also reported a history of two ruptured discs in his back. (Tr. 431). He was observed walking a bit bent over and using a cane. (Tr. 431). His back was tender, but no significant muscle wasting was noted. (Tr. 431). Zoloft was discontinued, Tramadol was continued, and Cymbalta was started.

Dr. Rajnikant Mehta examined Korgel in connection with his disability claim on February 21, 2008, at the request of the SSA. (Tr. 392-93). Sensation was noted as normal everywhere except the left foot where it was diminished. (Tr. 392). No swelling, redness, or inflammation was noted in the ankles. (Tr. 392-93). No back spasms were noted, although Korgel reacted as though

his back was painful. (Tr. 392). No muscle atrophy was observed. (Tr. 392). He limped slightly but was able to get up from his chair without much problem and go to the examination table, although he struggled somewhat to get off the table. (Tr. 393). Squatting was difficult. (Tr. 393). Range of motion in the neck and upper extremities was normal. (Tr. 393). Range of motion in the hip, knee, and ankle were normal on the right side and somewhat limited on the left. (Tr. 393). Motor function was normal. (Tr. 393). He was uncomfortable walking without his cane. (Tr. 393).

A state agency physician, Dr. Marlin Johnson, completed a "paper" physical residual functional capacity assessment on February 25, 2008, relying in part upon the findings of Dr. Mehta's examination. (Tr. 394-401). Dr. Johnson concluded that Korgel could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk for two hours per day, and sit for six hours per day. (Tr. 395). He concluded Korgel's complaints were partially credible but overstated. (Tr. 399).

A psychiatric "paper" review made by Dr. Hase, Ph.D., in February 2008 found Korgel was depressed, but the depression caused no functional limitations. (Tr. 402-15).

Korgel was seen by Dr. Scott for pain in his left wrist on January 24, 2008. (Tr. 385-86, 390-91). X-rays revealed minimal degenerative changes at the base of his thumb but were otherwise normal. (Tr. 390). Overuse of his cane was found to be causing soreness. (Tr. 386). He was advised to switch hands with his cane and exercise. (Tr. 391).

3. **Evidence after the relevant time period (7/1/08–Present)**

Korgel saw Dr. Reeve on August 20, 2008, for a recheck. (Tr. 430). It was noted the Cymbalta had not helped. (Tr. 430). Tramadol was continued. (Tr. 430). Korgel reported using Advil as needed for pain. (Tr. 430). He was referred to a pain management program. (Tr. 430).

Korgel completed a three-week pain management program in September 2008 at the Tri-Life Center, L.L.P., Chronic Pain Management Center ("Tri-Life"). (Tr. 432-539). There he was seen by a team of professionals consisting of: Dr. Olson, M.D.; Bonnie Sjol, R.N. and Certified Pain Management Guide; and Arlo Pretzer, P.T. During Korgel's initial evaluation, his medications were Cymbalta, Tramadol, and Advil. (Tr. 535). His back and left ankle were tender, but the ankle was not swollen. (Tr. 534). His gait was slightly unsteady. (Tr. 465). The diagnostic impression of the program team at the initial evaluation was a pain disorder secondary to both a general medical condition and psychological factors along with a depressive disorder, not otherwise specified. (Tr. 539).

As part of the Tri-Life program, Korgel completed a self evaluation. (Tr. 492-506). He stated the cause of his pain was nerve damage and ruptured discs. (Tr. 493). In describing how the pain affected his family he said it makes him "extremely irritable" and that "being treated like I am a liar by doctors and judges has made me very cynical and snide towards people in general (I basically no longer like the human race)." (Tr. 498). He rated his pain as a 4 on the best day and 10+ on the worst day. (Tr. 499). He reported sleeping or lying down fourteen hours per day, standing or walking two hours per day, and sitting eight hours per day in response to an activity questionnaire completed on August 21, 2008. (Tr. 499-500). He had a drivers license and could drive 30 minutes before needing a rest. (Tr. 500). He was able to bathe and dress himself. (Tr. 500).

Korgel listed video games, computers, and watching movies as his hobbies at the initial Tri-Life evaluation. (Tr. 490). Previous hobbies included horseback riding, boating, and jet skiing. (Tr. 490). He reported having a disc punctured during a nerve block as the cause of his back problems. (Tr. 488, 473). He also reported buying a boat and pickup truck in 2008. (Tr. 474).

As part of the Tri-Life program, Korgel kept a 24 hour daily pain log from September 2, 2008, through September 17, 2008. (Tr. 507-522). He reported pain ranging from a 4/10 to a 10/10. (Tr. 507-522). The pain was also reported as very disruptive of his sleep such that he gets five hours of sleep per night. (Tr. 464, 472).

By the third week of the course Korgel was described as doing well, sleeping better, and feeling much better overall. (Tr. 449). Posture and gait were improved as well. (Tr. 449). However, he continued to report pain ranging from 4/10 on the best day to 10/10 on the worst day. (Tr. 440). He reported sleeping or lying down ten hours per day, standing or walking four hours per day, and sitting ten hours per day in response to an activity questionnaire completed on September 18, 2008. (Tr. 441). The discharge summary found Korgel had improvement in the form of decreased pain, increased functional status, improved flexibility, improved balance, decreased chronic pain behaviors, and improved posture. (Tr. 439). He was discharged with a home program of postural and range of motion strengthening exercises. (Tr. 439).

Korgel saw Dr. Reeve on September 27, 2008. The record of that visit notes that Korgel had completed the Tri-Life program and was doing great. (Tr. 429). He was off the Tramadol, still using Cybalta, and his pain level had gone down two points. (Tr. 429). He still had back and ankle pain but was doing better. (Tr. 429).

At first recheck by the Tri-Life program on October 7, 2008, it was noted Korgel did his own house cleaning, laundry, cooking, and daily living activities. (Tr. 433). He had good sitting and walking posture although he had a somewhat stiff walking pattern. (Tr. 433).

Korgel saw Dr. Reeve again on March 17, 2009, complaining about a lump on his wrist. (Tr. 428). A ganglion cyst was diagnosed. (Tr. 428). The cyst was surgically removed on May 13, 2009. (Tr. 531).

In August 2009, just prior to the ALJ hearing, the three members of the Tri-Life team filled out a form physical capacities evaluation. Since there is no record of Korgel having attended Tri-Life in 2009, it appears this was an after-the-fact evaluation of Korgel's physical capacities at the time he completed the program in 2008. (Tr. 76-77). The Tri-Life team concluded that Korgel could at one time sit for 30-60 minutes, stand for 30 minutes, and walk for less than 30 minutes and on a daily basis sit for 2½ to 3 hours, stand for 1 hour, and walk for 1hour. (Tr. 523). They also concluded that Korgel would need to change positions often and leave his work station hourly to stretch. They further concluded that he would be unable to sit upright for long periods of time, would need to lie down periodically to relieve pain, and could lift and carry a maximum of five pounds. (Tr. 523). They rated his pain as marked, which was defined as restricting the ability to maintain concentration. (Tr. 524).

When contacted in April 2010 Dr. Reeve declined to offer an opinion as to whether Korgel was currently able to work as he had not seen him in nearly two years, but stated that he believed the 2006 [Argent] and 2009 [Tri-Life] functional capacity assessments were accurate at the time they were done. However, Dr. Reeve also stated that when he had seen Korgel in September 2008 after

completing the Tri-Life program that Korgel was doing better. (Tr. 540). This record was not considered by the ALJ since it was submitted for the first time to the Appeal Council.

### D. ALJ hearing

The ALJ convened an administrative hearing on August 28, 2009. (Tr. 28). Korgel appeared personally and was accompanied by his attorney. A vocational expert, Richard Ostrander, and Bonnie Sjol from the Tri-Life Pain Management Center were also present. (Tr. 30). Korgel's attorney requested an amended onset date of September 9, 2007, which is the day after his first application for DIB was denied. (Tr. 33). The ALJ agreed to this, and questioning proceeded. (Tr. 33).

Korgel testified he was 40 years old and lived on a farm three miles outside Minot with his 16 year old son. (Tr. 34). His son had been living with him for one year. (Tr. 34). As to education he stated he had completed one and one-half years of college and six months of technical school. (Tr. 35). He has no problems reading, but writing can become difficult after long periods due to neuropathy. (Tr. 35). He has a computer in his home which he uses for e-mail, Facebook, occasional web surfing, and gaming. (Tr. 36). He maintains a checking account. (Tr. 36). He is 5'11" and weighs 260 pounds which is about forty pounds more than normal and attributed to medication and lack of activity. (Tr. 37). He is right handed but somewhat ambidextrous. (Tr. 37). He had surgery on his left hand in 2009 to remove a ganglion cyst. (Tr. 38).

When asked why he could not work Korgel testified he is not able to do any kind of hard physical labor. (Tr. 38). He is not able to sit or stand for prolonged periods of time. (Tr. 38). Nor can he adhere to a set schedule. (Tr. 38). He stated his condition has worsened since his prior application for DIB benefits was denied in 2007. (Tr. 38). He last worked in 2004 for Sykes in

Minot. (Tr. 39). He has been living on an inheritance from his parents since that time. (Tr. 39). Since his last application in 2007, he has not looked for work or gone to Job Service. (Tr. 40). He reported taking Cymbalta 120 every day along with Advil and other over the counter pain medications. (Tr. 40). Cymbalta was prescribed by Dr. Olson as a pain inhibitor. (Tr. 41). To combat the pain, Korgel shifts positions regularly, puts his legs up, uses a heating pad, and does deep breathing exercises. (Tr. 41). He also goes to Tri-Life for water therapy three-five times a week. (Tr. 42).

Korgel reported doing very limited house work and light cooking. (Tr. 42-43). He does some laundry, vacuuming, sweeping, mopping, and yard work but gets a lot of help from his son. (Tr. 43-44). Push mowing is done by his son, but he is able to use the riding lawn mower for up to an hour at a time. (Tr. 44). There are three horses and two beef cattle on the farm which he waters and feeds with a bale feeder or "tool cat." (Tr. 45, 66). For recreation, he reads about one-third of, or three to four hours, a day. (Tr. 47, 54). Groceries are purchased twice a month with the help of his son. (Tr. 48). Korgel is able to drive a car and picks his son up at school every day. (Tr. 49-50). He reported being able to drive only fifteen or twenty minutes before his left leg would start bothering him and he would need to stop and stretch it out. (Tr. 50). However, he did travel to Bismarck by car as a passenger twice in 2009 and was able to get by with stopping once going down and twice coming back. (Tr. 52). He reported being able to sleep three hours at a time and getting around five hours of sleep per day although he reported going to bed at 11:30 p.m. and rising at 7:00 a.m. the day prior to the hearing before the ALJ. (Tr. 53). He also naps during the day, which accounts for some of the five hours of sleep per day reported. (Tr. 69). It is necessary to elevate his left leg regularly. (Tr. 56).

Doctor imposed limits were reported as lifting no more than five pounds and using a cane. (Tr. 56). He reported a worker's compensation appeal was pending. (Tr. 58). When asked if he could work in the office equipment repair business as he had for three years previously, he answered that he could not as the machines were too heavy for him to move around. (Tr. 60). He has a hard time walking one-eighth of a mile to the end of the road at his farm to get the mail. (Tr. 60-61). The outside of his left foot is constantly numb, and he is always in pain. (Tr. 61). He rated his pain, on a ten point scale, as a five or six on a daily basis. (Tr. 62). He did not attend a monthly chronic pain management support group as recommended by Tri-Life. (Tr. 69). On bad days he can hardly get out of bed as his pain is rated at a nine. (Tr. 70). This level of pain makes him nauseous. (Tr. 70). Bad days occur several times a week. (Tr. 71). He also reported shoulder problems resulting from his compensating for his bad foot and leg. (Tr. 72-73).

Bonnie Sjol testified she is the director of the Tri-Life Center chronic pain management program in Minot, North Dakota. (Tr. 74). Sjol handles case management and is a registered nurse. (Tr. 74). Korgel successfully completed the three-week program in the Fall of 2008. (Tr. 75, 434-522). Blue Cross/Blue Shield of North Dakota would not pay for follow-up visits so Korgel was unable to have any follow-up visits. (Tr. 75). However, he does still come in to use the therapy pool and visit. He keeps in contact with his support group and has good support from a man with whom he attended the program. (Tr. 75). In August 2009, Sjol, Dr. Olson, and a physical therapist completed a functional capacity evaluation, which states that Korgel is subject to certain restrictions, including lifting nothing heavier than five pounds in August 2009. (Tr. 77, 523). Sjol testified Korgel was not a malingerer. (Tr. 77). Tri-Life continued to provide him Cymbalta in the form of free samples because he could not afford them. (Tr. 82). Vocational rehabilitation was not

18

recommended because they were focused on trying to just get him back to living and being an active participant in life. (Tr. 83).

Vocational expert Richard Ostrander answered three hypothetical questions posed by the ALJ. (Tr. 85-88). He testified as to the first hypothetical that, if full credibility was given to Korgel's testimony he would not be capable of performing any of his past relevant work or any other work, including sedentary type work. (Tr. 85-86). As to the second hypothetical, which assumed the limitations described in a functional capacity report prepared State agency consultant Dr. Johnson on February 25, 2008, the vocational expert opined that Korgel could perform his past work as a telephone solicitor or computer support technician. (Tr. 86-87, 394-401). For the third hypothetical, the vocational expert was asked to assume the same limitations as the second hypothetical along with a limitation to occasionally lifting and carrying ten pounds and frequently lifting or carrying ten pounds or less. The vocational expert stated Korgel would still be able to perform the telephone solicitor or computer support technician jobs. (Tr. 87-88).

On cross-examination by Korgel's attorney the vocational expert testified that a need to take naps or periodically elevate his feet throughout the day would preclude competitive employment. He testified the same was true if Korgel was absent more than two days a week. (Tr. 89-90).

E.    **ALJ's decision**

The ALJ issued his written opinion denying Korgel's application for DIB on November 9, 2009. (Tr. 12-23). The amended alleged onset date was established as September 9, 2007. The amended onset date was mandated by Korgel's failure to appeal from the denial of an earlier application for DIB benefits which was issued on September 8, 2007. (Tr. 12). The ALJ reviewed Korgel's earnings record and determined that he had acquired sufficient quarters to be insured

through June 30, 2008. (Tr. 12-13). Thus, the relevant period of time under consideration was from September 9, 2007, through June 30, 2008.

When reviewing the application, the ALJ employed the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520. He quickly dispensed with the first step, finding that Korgel had not engaged in any substantial gainful activity between September 9, 2007, and June 30, 2008. (Tr. 14).

At the second step, the ALJ inquired into whether Korgel had a severe impairment. The ALJ acknowledged that Korgel had a history of problems with his lower left leg and ankle which the records describe as tarsal tunnel syndrome and for which he had surgery in 2005. (Tr. 15). The ALJ also acknowledged Korgel's back problems, noting degenerative changes in the facet joints, especially L5-S1. (Tr. 15). The combination of these two problems was found to constitute a severe impairment that more than minimally interfered with his ability to engage in basic work activities. (Tr. 15).

The ALJ also acknowledged and considered a number of other complaints Korgel had but which the ALJ found did not contribute to a finding of a severe impairment. These included mild obesity, left wrist pain, a left wrist ganglion cyst, situational depression, and pain related difficulties. (Tr. 15-16).

The obesity was mild with a body mass index of 33. (Tr. 15). Korgel's weight had actually declined during the relevant time period although it had increased subsequently. (Tr. 15). Korgel's weight was taken into consideration in assessing his residual functional capacity. (Tr. 15).

The ALJ found the record revealed only minimal degenerative changes in the left wrist and no particularly problematic medically determinable impairment during the relevant period. (Tr. 15).

As to the wrist problems, full range of motion, good grip strength, intact fine motor skills, and the ability to make a fist were noted. (Tr. 15). The ganglion cyst had been removed surgically without complications. (Tr. 15). Thus, no severe wrist impairment was found. (Tr. 16).

Situational depression was also noted during the relevant time period due to the death of Korgel's mother and grandmother. (Tr. 16). However, the record revealed the depression did not cause any particular limitations in basic mental activities or any decompensation. (Tr. 16). Thus, no severe mental impairment was found.

Some indication of pain related difficulty was also noted. (Tr. 16). The ALJ discounted any pain related difficulty due to reports that Korgel was able to pay attention, follow instructions, finish tasks, get along with authority figures, handle stress well, and accept change. (Tr. 16).

Also noted was an Axis I diagnosis along with a depressive disorder and a pain disorder. (Tr. 16). This diagnosis was rejected as having been made after the date last insured. (Tr. 16). A global assessment of functioning that was made along with the Axis I diagnosis was noted to be in keeping with a mild to moderate level of mental dysfunction which is not compatible with a finding of mental disability. (Tr. 16).

Moving on to the third step of his analysis, the ALJ compared Korgel's impairment to the presumptively disabling impairments listed 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 16). In so doing, he determined that Korgel did not have an impairment or combination of impairments that arose to "listing-level" severity, concluding that while Korgel has a severe impairment, no physician had opined that the impairments equaled a listed impairment alone or in combination. (Tr. 16).

The ALJ next assessed Korgel's residual functional capacity, *i.e.*, his "ability to do physical or mental work activities on a sustained basis despite limitations from his impairments." (Tr. 16-

17).  Upon consideration of the entire record, the ALJ found that Korgel had the residual functional capacity to perform sedentary work, relying primarily upon the functional capacity assessment prepared by State agency consultant Dr. Johnson  (Tr. 16-22).  The ALJ concluded that the record and objective medical evidence did not support the level of impairment claimed by Korgel during the relevant time period for a number of reasons discussed in more detail *infra*.  (Tr. 18-22).  The ALJ found Korgel's subjective complaints were less than credible and not supported by objective observation or assessment.  (Tr. 22).

At the fourth step  the ALJ determined Korgel was capable of performing his past relevant work as a telephone solicitor.  (Tr. 22).  Korgel had worked as a telemarketer from 2000-2001.  (Tr. 22).  The ALJ noted the vocational expert's testimony that this work fell in the sedentary category as Korgel had performed it and as available in the national economy.  (Tr. 22).  Consequently, the ALJ concluded that Korgel was not disabled as defined in the Social Security Act during the relevant time period.  (Tr. 23).

Having determined Korgel could perform his past relevant work as a telemarketer, the analysis ended without reaching the fifth step which would have required determining whether Korgel could perform other work considering his residual functional capacity, age, education, and work experience.

## II.     GOVERNING LAW

### A.     Standard of review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review.  Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence.  Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id. Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion. Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993). The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis v. Barnhart, 392 F.3d at 993.

**B.      Law governing eligibility for adult benefits**

"To be eligible for disability insurance benefits, a claimant has the burden of establishing the existence of a disability under the Social Security Act ("Act").  42 U.S.C. § 423(a)(1)(D).  To meet this burden, the claimant must show: (1) a medically determinable physical or mental impairment that has lasted, or can be expected to last, for not less than twelve months; (2) an inability to engage in any substantial gainful activity; and (3) that this inability results from the impairment. 42 U.S.C. § 423(d)(1)(A)."  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).

"Substantial gainful activity" under the Act includes any substantial gainful work that exists in the national economy, regardless of (1) whether such work exists in the immediate area in which the claimant lives, (2) whether a specific job vacancy exists for the claimant, or (3) whether the claimant would be hired if he or she applied for work.  42 U.S.C. § 423(d)(2)(A).  Work available in the national economy with respect to a particular person means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id.

In deciding whether a claimant is disabled within the meaning of the Act,  the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. § 404.1520 and determine:

(1)      whether the claimant is presently engaged in a substantial gainful activity,

(2)      whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)      whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)      whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)      if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth step, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations. 20 C.F.R. § 404.1545. The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[1] E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005). Claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall v. Massanari, 274 F.3d at 1218.

Also, the ALJ must give controlling weight to medical opinions of treating physicians that are supported by accepted diagnostic techniques and that are not inconsistent with other substantial evidence. Ellis v. Barnhart, 392 F.3d at 994-995. This rule does not apply, however, to opinions regarding disability or inability to work because these determinations are within the exclusive province of the Commissioner. Id.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner. The Commissioner is charged with making her own disability determination based upon the criteria set forth in the Social Security law. 20 C.F.R. § 404.1504. E.g., Jenkins v.

---

[1] The Polaski factors are now embodied in 20 C.F.R. § 404.1529.

<u>Chater</u>, 76 F.3d 231, 233 (8th Cir. 1996). If the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. <u>Pearsall v. Massanari</u>, 274 F.3d at 1217.

## III.  ANALYSIS AND DISCUSSION

Korgel makes five arguments in support of his motion for summary judgment: (1) the Appeals Council failed to review new evidence submitted by Korgel; (2) Korgel's impairments equal Listing 1.02; (3) the ALJ failed to give controlling weight to evidence that was contrary to his RFC determination or, in the alternative, he failed to sufficiently explain why he did not give it controlling weight; (4) the ALJ improperly rejected Korgel's subjective complaints of pain; and (5) the ALJ erred in refusing to recuse himself.

In response, the Commissioner argues that Korgel failed to show his impairments were disabling during the relevant time period and that substantial evidence supports the ALJ's findings regarding listing 1.02, the evaluation of the medical opinion evidence, and the finding that Korgel's complaints of pain were not fully credible. In addition, the Commissioner argues the ALJ was not required to recuse himself.

### A.  Appeals Council Review

In support of his request for review by the Appeals Council, Korgel submitted a letter from Dr. Reeve to Korgel's attorney dated April 12, 2010. (Tr. 540). This was the only additional evidence submitted by Korgel. Korgel argues that the Appeals Council erred in denying his request for review because it failed to review this new and additional supporting evidence before denying review.

Korgel is mistaken. Before denying review, the Appeals Council did review the additional evidence submitted by Korgel. (Tr. 1, 5). The Notice of Appeals Council Action specifically states that "we considered...the additional evidence listed on the enclosed Order of the Appeals Council" and the Order lists Dr. Reeve's letter of April 12, 2010. (Tr. 1, 4).

Since the Appeals Council considered the additional evidence, this court does not evaluate its decision to deny review under controlling Eighth Circuit precedent. Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000); Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994). Instead, the court must determine whether the ALJ's decision is supported by substantial evidence on the record as a whole, including the additional evidence submitted to the Appeals Council. Id.

### B.    Listing-level impairment

Korgel argues that his impairments meet or equal the requirements of listing 1.02, which is entitled "Major Dysfunction of a Joint." See 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02. Korgel references insomnia, chronic pain syndrome, and an inability to ambulate effectively as the impairments which equal listing 1.02.

A listing-level impairment is one that is presumptively disabling without consideration of the claimant's age, education, and work experience. 20 C.F.R. § 404.1520(d). The burden is on the claimant to show he has a listing-level impairment. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004). In order to meet this burden, the claimant must show he meets all the specified medical criteria. Sullivan v. Zebley, 493 U.S. 521, 530 (1990). An impairment that meets only some of the criteria, no matter how severe, is insufficient. Id.

Listing 1.02 provides as follows:

1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis,

27

instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02.   Effective ambulation is defined to mean:

b. What We Mean by Inability to Ambulate Effectively

(1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

See 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2b.

Although Korgel's ability to walk is impaired and he uses a cane  (Tr. 15-16, 386), he is still

able to ambulate effectively as defined in § 1.00B2b.  Among other things, he has a driver's license

28

and is able to drive a car. (Tr. 49-50). He drives his son home from school. (Tr. 49-50). He can

hook up and load cattle in a stock trailer with help. (Tr.46). He uses a "tool-cat"[2] to feed livestock

on his farm. (Tr. 45, 66). He can use a riding lawn mower for up to one hour at a time. (Tr. 44).

He does not use a walker, two crutches, or two canes. There is no evidence he needs companion

assistance when traveling. Finally, Korgel can complete all his daily living activities, including

house cleaning, cooking, laundry, bathing, and dressing, although it takes him longer. (Tr. 226, 433,

441).

In short, there is substantial evidence supporting the ALJ's conclusion that Korgel's

impairments do not meet or equal listing 1.02.

## C.     The ALJ's RFC determination

### 1.     Introduction

Having reached the fourth step of the five-step sequential analysis, the ALJ was required to

assess Korgel's RFC. The ALJ determined that: (1) Korgel could lift and/or carry twenty pounds

occasionally and ten pounds frequently; (2) Korgel could stand/or walk (with normal breaks) for a

total of about two hours in an eight hour work day; (3) Korgel could sit (with normal breaks) for

about six hours in an eight hour workday; (4) Korgel's ability to push or pull was limited (including

operation of foot controls), given the issues with his left lower extremity; (5) Korgel could

occasionally engage in all postural activities, except never any climbing on ladders, ropes, or

scaffolds; and (6) that there were no manipulative, visual, communicative, or environmental

limitations. The ALJ then relied upon his RFC determination, together with testimony from the

---

[2] A piece of farm equipment similar to a Bobcat or small tractor. (Tr. 66).

vocational expert, to conclude that Korgel was capable of returning to his past relevant work and therefore was not disabled.

The primary medical evidence that the ALJ relied upon for his RFC determination was the "paper" assessment of Korgel's RFC completed by the nontreating, nonexamining State agency consultant, Dr. Marlin Johnson, on February 25, 2008.[3] Although Dr. Johnson did not personally examine Korgel, his assessment relied in part upon the results of a physical examination of Korgel conducted earlier the same month by Dr. Mehta.[4]

Korgel disagrees with the ALJ's RFC determination. He points to other evidence in the record which he claims demonstrates his inability to perform even sedentary work in a competitive environment, allegedly because of a need to frequently take breaks and change positions (including having to lay down and elevate his feet periodically throughout the day) and because of the

_____

[3] The February 25, 2008, report identifies the preparer simply as "Marlin Johnson." The only way the court could figure out Johnson's professional status was to look to another form in the record that identified him as being an MD. (Tr. 20). Similarly, when Korgel asked the State agency to reconsider his denial of benefits, another consultant, who signed his report as "Curtis Juhala," reviewed the records and affirmed Dr. Johnson's determination. The court could not find any reference in the record to Juhala being a physician. Fortunately, the outcome in this case does not rest upon Juhala's conclusions. [The undersigned is personally aware that Juhala is an MD and not, for example, a clinical psychologist. For many years, Dr. Juhala practiced in Bismarck, N.D., specializing in reconstructive surgery.].

If the Commissioner wants the court to conclude there is substantial evidence in the record supporting a denial of benefits and relies upon the opinion of a State agency consultant for that evidence, there must be some indication of what kind of professional the consultant was. Also, unless the specialization of the consultant is indicated, the court cannot assume the consultant has any relevant speciality for purposes of 20 C.F.R. § 404.1527(d)(5). See 20 C.F.R. § 1527(f)(2)(ii). And, if the only indication is that the consultant is an MD, the court can only assume that the consultant has minimum qualifications for a general medical degree, and no other relevant medical experience, absent being provided other information. In other words, for all the court would know, the consultant MD may be a retired eye doctor opining on orthopedic issues. Certainly, it would not be that much trouble for the SSA to include in the record a curriculum vitae for its medical consultants. The court notes this is routinely done for the vocational experts who testify at the ALJ hearing.

[4] Why the SSA had Dr. Mehta conduct an examination and Dr. Johnson make the RFC assessment is unclear. Arguably, the person who conducted the examination would have been in a better position to make the assessment, particularly here where the critical RFC findings were not the subject of any direct tests or observations by Dr. Mehta and involved making judgments from more general findings and observations for which personally having observed the claimant would have been beneficial.

likelihood of an unacceptable number of absences from work.  Korgel argues that the ALJ erred in not giving controlling weight to this evidence and, in the alternative, that he failed to sufficiently explain why he did not give it controlling weight.

### 2.    Whether the ALJ erred in failing to give controlling weight to evidence contrary to his RFC determination

According to Korgel,  the ALJ's  failure to give controlling weight to the evidence contrary to his RFC determination was the result of two more specific errors.  The first, Korgel argues, was a failure to properly apply the factors set forth in 20 C.F.R. § 1527(d) for evaluation of medical opinion evidence, which are:

(1)    *the examining relationship* - generally more weight is to be given to the opinions of sources who have conducted an examination;

(2)    *the treatment relationship* - generally more weight is to be given to treating sources, with particular consideration to be given to (i) the length of treatment and frequency of examination and (ii) the nature and extent of the treatment relationship, including whether the source is providing treatment  for the particular condition at issue;

(3)    *supportability* - generally more weight is to be  given to opinions that are supported by medical signs and testing as well as opinions that provide a better explanation for the opinions;

(4)    *consistency* - generally  more  weight  is  to  be  given  to  those  opinions  that  are consistent with record as a whole;

(5)    *specialization* - generally more weight is to be given to the opinions of a specialist; and

(6) *other factors*, including the degree of the source's understanding of disability programs and their evidentiary requirements and the extent of familiarity with the information in the case record.

<u>See</u> 20 C.F.R. § 1527(d)(1)-6).

Korgel argues that proper application of these factors required giving controlling weight to the 2009 Tri-Life functional capacity evaluation given that: (1) the Tri-Life team had a treating relationship with Korgel; (2) the 2009 Tri-Life evaluation was longitudinally consistent with the 2006 functional capacity assessment completed by PT Reed Argent; and (3) the 2006 and 2009 functional capacity evaluations were consistent with Korgel's self-evaluation form and hearing testimony, as well as the corroborating layperson evidence from one of Korgel's friends. Finally, Korgel argues that, if there is any doubt now about the weight that should have been given to the 2009 Tri-Life evaluation, it is eliminated by Dr. Reed's 2010 letter, which was submitted to the Appeals Council and in which Dr. Reed (Korgel's longtime treating physician) states he believes that the 2006 and 2009 functional capacity evaluations were likely correct. And, as the ALJ recognized in his decision, the 2006 and 2009 evaluations concluded that Korgel's functional capacity was more limited than what he determined and, if fully accepted, supported a finding of disability.

Korgel also argues that the ALJ erred in discounting his descriptions of his physical limitations as well as his pain complaints. Korgel argues that the ALJ can only discount this evidence if it was inconsistent with record taken as whole, which he argues was not the case here.

While Korgel's arguments have substantial force, particularly given the medical opinion evidence he marshals, "[i]t is the ALJ's function to resolve conflicts among the opinions of various

treating and examining physicians." <u>Pearsall v. Massanari</u>, 274 F.3d at 1219.  The same is true for deciding what weight should be accorded a claimant's subjective complaints of pain and descriptions of his or her limitations.  <u>See</u> <u>Teague v. Astrue</u>, 638 F.3d 611, 615 (8th Cir. 2011).  Consequently, the issue here is not what weight this court would give to the evidence, but rather whether the reasons given by the ALJ for discounting the evidence favorable to Korgel are plausible and supported by substantial evidence.  <u>Id.</u> at 614-15.  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." <u>Id.</u>, at 614 (internal quotations and citations omitted).

One of the reasons the ALJ gave for discounting the evidence favorable for Korgel was the lack of an objective cause for the debilitating pain being claimed by Korgel in his lower back and in his lower left extremity.  (Tr. 18-22).  Lack of objective medical evidence is one factor that an ALJ can consider in weighing opinion evidence as well as the subjective complaints of the claimant. <u>Renstrom v. Astrue</u>, 680 F.3d 1057, 1064-66 (8th Cir. 2012).  And here, there is support for the ALJ's conclusion that there was the lack of an objective cause for debilitating pain and resulting limitations being claimed by Korgel.  This is the case for the medical records dating back to the onset of these alleged impairments, which were the subject of an earlier unsuccessful effort to obtain disability and in which two of his treating physicians opined there were no reason why Korgel could not then return to work (Tr. 283, 285, 292-93, 303, 305-06, 316-321, 327, 331, 334, 336).  It is also the case for the more recent medical evidence (Tr. 372-75, 382, 392-93, 429-31, 533-34), including a neurosurgical consult in June 2007 that reviewed the numerous reports and studies prior to that date (Tr. 372-75).

The ALJ also concluded that both the 2006 and 2009 functional capacity evaluations relied primarily upon Korgel's subjective complaints for the conclusions of particular relevance as to whether he had the capacity to competitively perform his past relevant work, which subjective complaints the ALJ further concluded were not entirely credible. (Tr. 21-22 ). After a careful review of the evaluations, together with all of the Tri-Life records (Tr. 424-27, 433-539), the court cannot conclude the ALJ was clearly wrong about this point. And the fact that the opinion evidence is based on a claimant's subjective complaints is a factor that the ALJ can properly consider in deciding what weight to give the evidence. See Renstrom v. Astrue, 680 F.3d at 1064-65; Teague v. Astrue, 638 F.3d at 616.

Another reason given by the ALJ for discounting Korgel's evidence was the conclusion that Korgel's daily living activities were inconsistent with his subjective complaints as well as the conclusions of the 2006 and 2009 functional capacity evaluations regarding the degree of his limitations. The ALJ noted that Korgel had lived alone on his farm tending to all his household and farm chores during most of the period at issue with only occasional outside help, and it was not until just before the date he was last insured that his teenage son came to live with him and provided assistance. The farm chores included the feeding and watering of several head of cattle, several horses, and a number of chickens. (Tr. 19). In addition, the ALJ noted that Korgel acknowledged the ability to: feed livestock with a "tool cat;" read for three to four hours per day; drive a car and pick up his son from school every day; and use a riding lawn mower for up to an hour at a time to mow his lawn. (Tr.19). There is evidentiary support in the record for the daily living activities relied upon by the ALJ. (Tr. 28-30, 47, 49-50, 54). Some of these activities do raise questions regarding the extent of Korgel's claimed impairments, and the extent to which a claimant can

perform daily living activities is a factor the ALJ can consider in evaluating the opinion evidence as well as the claimant's own subjective complaints.[5] See, e.g., Renstrom v. Astrue, 680 F.3d at 1067.

The ALJ also concluded that Korgel's pain-related complaints and testimony regarding his limitations were not entirely credible. As already discussed, he pointed to the lack of objective medical evidence supporting the degree of pain and limitations being claimed. He also noted that Korgel repeatedly claimed he had two ruptured disks in his back caused by an injection given to block pain in his left lower extremity and that there is no medical evidence to support this. (Tr. 18 374). Finally, and probably more significantly, the ALJ concluded that Korgel's statements regarding the degree of his pain and the resulting limitations were inconsistent with his daily living activities. (Tr. 18-22). The claimant's credibility is a factor the ALJ can consider not only with respect to the claimant's own statements and testimony but also with respect to medical opinion evidence that is based primarily upon a history provided by the claimant or the claimant's subjective complaints. See, e.g., Renstrom v. Astrue, 680 F.3d at 1064-67.

Finally, the ALJ also pointed to the medical evidence that he viewed as being inconsistent with the evidence relied upon by Korgel. This included: (1) the results of the physical examination conducted by Dr. Mehta in February 2008; (2) the functional capacity assessment made by Dr. Johnson, which in part relied upon the results of the physical examination by Dr. Mehta and which stated that Korgel's claimed limitations were only "partially credible" and "appear overstated." (Tr.

---

[5] In addition to the specific points noted by the ALJ, Korgel reported buying a boat in 2008 despite reporting that his pain prevented him from boating or jet skiing any longer. (Tr. 474, 490). Also, while undergoing the Tri-Life program, Korgel did his own house cleaning, laundry, cooking, and other daily living activities, despite, in some cases, reporting pain in the 5/10 to 7/10 range. (Tr. 433, 508-510). And, on one day, he reported pain of 9/10 and 10/10 during a period when he was helping a friend move. (Tr. 522). That Korgel would undertake such labor is seemingly inconsistent with the amount of pain he consistently reported. Finally, there is no record of his ever having sought emergency medical treatment when his reported pain levels reached 10/10.

399); and (3) the statement by Dr. Reeve in his notes of examination of Korgel immediately following his completion of the Tri-Life program that Korgel reported his low back and ankle pain was better and Dr. Reeve's conclusion was that he had an excellent result from the Tri-Life program (Tr. 21-22, 429). This too is evidence the ALJ can consider in applying the 20 C.F.R. § 1527(d) factors for the evaluation of medical evidence as well as the claimant's own subjective complaints. See id.

In summary, the court cannot conclude that the ALJ erred in failing to give controlling weight to the evidence that was contrary to his RFC determination. The reasons that the ALJ gave for discounting this evidence were at least plausible. And, while this court may have weighed the evidence differently, there appears to be substantial evidence supporting the ALJ's reasoning.

Lastly, the court is also convinced that the outcome would not have been different if the ALJ had been presented with the opinion expressed by Dr. Reed in his 2010 letter (which Korgel submitted to the Appeal Council) that the 2006 and 2009 physical capacity evaluations were in his view correct. This is because Dr. Reed had expressed the opinion in his treatment notes that he believed Korgel to be disabled and his letter provided no explanation for why he believed the evaluations were correct. In other words, if the ALJ had the benefit of Dr. Reed's letter, the court is convinced the ALJ had would have continued to discount Dr. Reed's opinions for the reasons he articulated and for which the court has concluded there is substantial evidence.

**3.    Whether the ALJ failed to adequately explain his consideration of the medical evidence**

Korgel contends that the ALJ failed to properly explain why he discounted the medical opinion evidence favorable to Korgel - particularly Tri-Life's functional capacity evaluation. The court disagrees.

The ALJ specifically discussed the functional capacity evaluation made by the Tri-Life team as well as the 2006 evaluation by physical therapist Argent and observed that both would have required a finding of disability if fully accepted. (Tr. 21-22). He also recognized, contrary to Korgel's suggestion to the contrary, that Tri-Life utilized a team approach and that the "team" was comprised of a doctor and physical therapist along with RN Sjol, who testified at the hearing. He also professed to have considered the opinion evidence longitudinally and the requirements of 20 C.F.R. § 1527. (Tr. 17, 21). Finally, and most importantly, he did give specific reasons for why he discounted the medical opinion evidence favorable to Korgel as already outlined.

In summary, the ALJ recognized and considered the opinion evidence that Korgel claims he gave short shrift to. Also, the specific reasons the ALJ gave for discounting the evidence reflect that he applied the 20 C.F.R. § 1527(d) factors, even if he did not discuss all of them. Further, the court is convinced that any deficiency in the ALJ's opinion-writing had no practical effect on the outcome. See, e.g., Buckner .v Astrue, 646 F.3d 549, 559-560 (8th Cir. 2011).

### D.     Korgel's subjective complaints

Korgel claims that the ALJ erred in concluding that his complaints of pain and resulting physical limitations were not entirely credible. However, as already discussed in the prior section, the ALJ did give reasons why he discounted Korgel subject complaints, which included that the subjective complaints were not entirely supported by the credible medical evidence and were inconsistent with his daily living activities. In so doing, the ALJ discussed many of the Polaski factors, even if he did not identify them by name, and there is evidentiary support for the reasons the ALJ gave. Under these circumstances, the court is required to defer to the ALJ's credibility determination. E.g., Renstrom v. Astrue, 680 F.3d at 1066-67.

37

### E.	Recusal

Prior to the ALJ hearing, Korgel submitted a letter requesting that the ALJ recuse himself. (Tr. 150).  The only reason expressed for the requested recusal was that the ALJ had ruled on Korgel's 2007 application for DIB and found him ineligible.  (Tr. 150).  The ALJ denied the request, stating he knew of no reason why he should recuse himself.  (Tr. 151).

A disability claimant is entitled to a "full and fair hearing" under the Social Security Act. Hepp v. Astrue, 511 F.3d 798, 804 (8th Cir. 2008) (citing Northcutt v. Califano, 581 F.2d 164, 167 (8th Cir.1978)).  ALJ's are considered to be quasi-judicial officers presumed to be unbiased.  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).  This presumption can be overcome, however, by showing a specific reason necessitating recusal.  Id. at 857-58.

Korgel argues in his briefing here that the ALJ was biased because he had concluded in the earlier DIB proceeding that Korgel's subjective complaints were not credible and requests a remand for a new determination by a different ALJ. (Tr. 105).  The problem with this objection, however, is that Korgel failed to specify it as a grounds for recusal in his letter.  But, even putting that aside, Korgel's objection lacks merit.

The Social Security Administration regulation that appears to govern recusals provides as follows:

> An administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision. If you object to the administrative law judge who will conduct the hearing, you must notify the administrative law judge at your earliest opportunity. The administrative law judge shall consider your objections and shall decide whether to proceed with the hearing or withdraw. If he or she withdraws, the Associate Commissioner for Hearings and Appeals, or his or her delegate, will appoint another administrative law judge to conduct the hearing. If the administrative law judge does not withdraw, you may, after the hearing, present your objections to

the Appeals Council as reasons why the hearing decision should be revised or a new hearing held before another administrative law judge.

20 C.F.R. § 404.940. Notably, the fact that an ALJ has previously ruled against a claimant (and in the process questioned the claimant's credibility) is not listed as a grounds for recusal. This section has been interpreted as requiring a showing of actual bias. E.g., Bunnell v. Barnhart, 336 F.3d 1112, 1115 (9th Cir.2003).

Generally speaking, adverse "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Liteky v. United States, 510 U.S. 540, 555 (1994). In addition, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Id.

Here, Korgel has not pointed to anything from the earlier proceeding or from this record that evidenced a deep-seated antagonism on the part of the ALJ that would make a fair judgment impossible. In fact, Korgel did not appeal the earlier denial of DIB. In summary, Korgel's request for a remand for a new hearing before a different ALJ is without merit.

IV.     **CONCLUSION AND ORDER**

Based on the foregoing, the Commissioner's motion for summary judgment of dismissal of

Korgel's complaint (Docket No. 16) is **GRANTED** and Korgel's motion for summary judgment

(Docket No. 13) is **DENIED**.  Let judgment be entered accordingly.

**IT IS SO ORDERED.**

Dated this 12th day of July, 2012.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge